**UNITED STATES DISTRICT COURT**
**EASTERN DISTRICT OF MICHIGAN**
**SOUTHERN DIVISION**

WILLIAM E. DENNIS,

    *Plaintiff*,

*v.*                        CASE NO. 13-CV-12754

CAROLYN W. COLVIN         DISTRICT JUDGE SEAN F. COX
Acting Commissioner of Social    MAGISTRATE JUDGE PATRICIA T. MORRIS
Security,

    *Defendant*.

_____/

**MAGISTRATE JUDGE'S REPORT AND RECOMMENDATION**[1]

## I.    RECOMMENDATION

In light of the entire record in this case, I suggest that substantial evidence supports the Commissioner's determination that Plaintiff is not disabled. Accordingly, **IT IS RECOMMENDED** that Plaintiff's Motion for Summary Judgment be **DENIED**, that Defendant's Motion for Summary Judgment be **GRANTED**, and that the findings of the Commissioner be **AFFIRMED**.

## II.    REPORT

### A.    Introduction and Procedural History

Pursuant to 28 U.S.C. § 636(b)(1)(B), E.D. Mich. LR 72.1(b)(3), and by Notice of Reference, this case was referred to the undersigned for the purpose of reviewing the

---

[1] The format and style of this Report and Recommendation are intended to comply with the requirements of the E-Government Act of 2002, Pub. L. 107-347, 116 Stat. 2899 (Dec. 17, 2002), Fed. R. Civ. P. 5.2(c)(2)(B), E.D. Mich. Administrative Order 07-AO-030, and guidance promulgated by the Administrative Office of the United States Courts found at: http://www.uscourts.gov/RulesAndPolicies/JudiciaryPrivacyPolicy/March2008RevisedPolicy.aspx. This Report and Recommendation only addresses the matters at issue in this case and is not intended for publication in an official reporter or to serve as precedent.

Commissioner's decision denying Plaintiff's claims for Disability Insurance Benefits ("DIB"). This matter is currently before the Court on cross-motions for summary judgment. (Docs. 11, 13.)

Plaintiff William E. Dennis was fifty years old at the time of the most recent administrative hearing. (Transcript, Doc. 8 at 44.) Plaintiff's past work includes jobs as a security officer from June 1987 until October 1999 and as a painter and in construction at two businesses from October 1999 until October 2010.[2] (Tr. at 188.) On September 1, 2010, Plaintiff filed the present claim for Supplemental Security Income ("SSI") under Title XVI, 42 U.S.C. § 1381 *et seq*. (Tr. at 168.) Plaintiff alleged he became disabled on June 23, 2006. (Tr. at 168.)

The claim was denied at the initial administrative stage. (Tr. at 83.) In denying Plaintiff's claims, the Commissioner considered dermatitis and discogenic and degenerative back disorders. (*Id.*) On December 22, 2011, Plaintiff appeared before Administrative Law Judge ("ALJ") Christopher Ambrose, who considered the application for benefits de novo. (Tr. at 35-82.) In a decision dated February 1, 2012, the ALJ found that Plaintiff was not disabled. (Tr. at 18-29.) Plaintiff requested a review of this decision on April 5, 2012. (Tr. at 8.)

The ALJ's decision became the Commissioner's final decision, *see Wilson v. Comm'r of Soc. Sec.*, 378 F.3d 541, 543-44 (6th Cir. 2004), on April 23, 2013, when the Appeals Council denied Plaintiff's request for review. (Tr. at 1-3.) On June 21, 2013, Plaintiff filed the instant suit seeking judicial review of the Commissioner's unfavorable decision. (Doc. 1.)

### B. Standard of Review

---

[2] Plaintiff provided a slightly different work history elsewhere in the record. (Tr. at 188.) There, he stated he had the same security job, but that he worked as a painter for six months in 2000 and in painting and construction from November 1999 until October 2008. (*Id.*)

The Social Security system has a two-tiered structure in which the administrative agency handles claims and the judiciary merely reviews the factual determinations to ensure they are supported by substantial evidence. 42 U.S.C. § 405(g); *Richardson v. Perales*, 402 U.S. 389, 390 (1971). The administrative process provides multiple opportunities for reviewing the state agency's initial determination. The Plaintiff can first appeal the decision to the Social Security Agency, then to an ALJ, and finally to the Appeals Council. *Bowen v. Yuckert*, 482 U.S. 137, 142 (1987). Once this administrative process is complete, an unsuccessful claimant may file an action in federal district court. *Sullivan v. Zebley*, 493 U.S. 521, 524-28 (1990), *superseded by statute on other grounds*, Personal Responsibility and Work Opportunity Reconciliation Act of 1996, Pub. L. No. 104-193, 110 Stat. 2105; *Mullen v. Bowen*, 800 F.2d 535, 537 (6th Cir. 1986) (en banc).

This Court has original jurisdiction under 42 U.S.C. § 405(g) to review the Commissioner's final administrative decision. The statute limits the scope of judicial review, requiring the Court to "'affirm the Commissioner's conclusions absent a determination that the Commissioner has failed to apply the correct legal standards or has made findings of fact unsupported by substantial evidence in the record.'" *Longworth v. Comm'r of Soc. Sec.*, 402 F.3d 591, 595 (6th Cir. 2005) (quoting *Warner v. Comm'r of Soc. Sec.*, 375 F.3d 387, 390 (6th Cir. 2004)). *See also Walters v. Comm'r of Soc. Sec.*, 127 F.3d 525, 528 (6th Cir. 1997). The court's review of the decision for substantial evidence does not permit it to "'try the case *de novo*, resolve conflicts in evidence, or decide questions of credibility.'" *Ulman v. Comm'r of Soc. Sec.*, 693 F.3d 709, 713 (6th Cir. 2012) (quoting *Bass v. McMahon*, 499 F.3d 506, 509 (6th Cir. 2007)). *See also Garner v. Heckler*, 745 F.2d 383, 387 (6th Cir. 1984).

The Commissioner's findings of fact are conclusive if supported by substantial evidence. 42 U.S.C. § 405(g). Therefore, a court may not reverse the Commissioner's decision merely because it disagrees or because "'there exists in the record substantial evidence to support a different conclusion.'" *McClanahan v. Comm'r of Soc. Sec.*, 474 F.3d 830, 833 (6th Cir. 2006) (quoting *Buxton v. Halter*, 246 F.3d 762, 772 (6th Cir. 2001)). *See also Mullen*, 800 F.2d at 545. The court can only review the record before the ALJ. *Bass*, 499 F.3d at 512-13; *Foster v. Halter*, 279 F.3d 348, 357 (6th Cir. 2001). Substantial evidence is "more than a scintilla of evidence but less than a preponderance; it is such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Cutlip v. Sec'y of Health & Human Servs.*, 25 F.3d 284, 286 (6th Cir. 1994). *See also Jones v. Comm'r of Soc. Sec.*, 336 F.3d 469, 475 (6th Cir. 2003). "[T]he . . . standard is met if a 'reasonable mind might accept the relevant evidence as adequate to support a conclusion.'" *Longworth*, 402 F.3d at 595 (quoting *Warner*, 375 F.3d at 390). "The substantial evidence standard presupposes that there is a '"zone of choice"' within which the Commissioner may proceed without interference from the courts." *Felisky v. Bowen*, 35 F.3d 1027, 1035 (6th Cir. 1994) (citations omitted) (quoting *Mullen*, 800 F.2d at 545).

A court's review of the Commissioner's factual findings for substantial evidence must consider the evidence in the record as a whole, including that evidence which might subtract from its weight. *Wyatt v. Sec'y of Health & Human Servs.*, 974 F.2d 680, 683 (6th Cir. 1992). "Both the court of appeals and the district court may look to any evidence in the record, regardless of whether it has been cited by the Appeals Council." *Heston v. Comm'r of Soc. Sec.*, 245 F.3d 528, 535 (6th Cir. 2001). There is no requirement, however, that either the ALJ or the reviewing court discuss every piece of evidence in the administrative record. *Van Der Maas v. Comm'r of Soc. Sec.*, 198

F. App'x 521, 526 (6th Cir. 2006); *Kornecky v. Comm'r of Soc. Sec.*, 167 F. App'x 496, 508 (6th Cir. 2006) ("'[A]n ALJ can consider all the evidence without directly addressing in his written decision every piece of evidence submitted by a party.'" (quoting *Loral Defense Systems-Akron v. N.L.R.B.*, 200 F.3d 436, 453 (6th Cir. 1999))).

### C.      Governing Law

"'The burden lies with the claimant to prove that she is disabled.'" *Ferguson v. Comm'r of Soc. Sec.*, 628 F.3d 269, 275 (6th Cir. 2010) (quoting *Foster*, 279 F.3d at 353). *Accord Boyes v. Sec'y of Health & Human Servs.*, 46 F.3d 510, 512 (6th Cir. 1994)). There are several benefits programs under the Act, including the DIB program of Title II, 42 U.S.C. § 401-34, and the Supplemental Security Income ("SSI") program of Title XVI, 42 U.S.C. § 1381-1385. Title II benefits are available to qualifying wage earners who become disabled prior to the expiration of their insured status; Title XVI benefits are available to poverty stricken adults and children who become disabled. F. Bloch, *Federal Disability Law and Practice* § 1.1 (1984). While the two programs have different eligibility requirements, "DIB and SSI are available only for those who have a 'disability.'" *Colvin v. Barnhart*, 475 F.3d 727, 730 (6th Cir. 2007). "Disability" means inability

> to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than [twelve] months.

42 U.S.C. §§ 423(d)(1)(A), 1382c(a)(3)(A) (DIB); 20 C.F.R. § 416.905(a) (SSI).

The Commissioner's regulations provide that disability is to be determined through the application of a five-step sequential analysis:

Step One:  If the claimant is currently engaged in substantial gainful activity, benefits are denied without further analysis.

Step Two:  If the claimant does not have a severe impairment or combination of impairments that "significantly limits . . . physical or mental ability to do basic work activities," benefits are denied without further analysis.

Step Three:  If the claimant is not performing substantial gainful activity, has a severe impairment that is expected to last for at least twelve months, and the severe impairment meets or equals one of the impairments listed in the regulations, the claimant is conclusively presumed to be disabled regardless of age, education or work experience.

Step Four:  If the claimant is able to perform his or her past relevant work, benefits are denied without further analysis.

Step Five:  Even if the claimant is unable to perform his or her past relevant work, if other work exists in the national economy that plaintiff can perform, in view of his or her age, education, and work experience, benefits are denied.

20 C.F.R. §§ 404.1520, 416.920. *See also Heston*, 245 F.3d at 534. "If the Commissioner makes a dispositive finding at any point in the five-step process, the review terminates." *Colvin*, 475 F.3d at 730.

"Through step four, the claimant bears the burden of proving the existence and severity of limitations caused by her impairments and the fact that she is precluded from performing her past relevant work." *Jones*, 336 F.3d at 474. *See also Cruse v. Comm'r of Soc. Sec.*, 502 F.3d 532, 540 (6th Cir. 2007). The burden transfers to the Commissioner if the analysis reaches the fifth step without a finding that the claimant is not disabled. *Combs v. Comm'r of Soc. Sec.*, 459 F.3d 640, 643 (6th Cir. 2006). At the fifth step, the Commissioner is required to show that "other jobs in significant numbers exist in the national economy that [the claimant] could perform given her RFC [residual functional capacity] and considering relevant vocational factors." *Rogers v. Comm'r of Soc. Sec.*, 486 F.3d 234, 241 (6th Cir. 2007) (citing 20 C.F.R. §§ 416.920(a)(4)(v), (g)).

6

### D.    ALJ Findings

The ALJ applied the Commissioner's five-step disability analysis to Plaintiff's claim and found at step one that Plaintiff had not engaged in substantial gainful activity since August 19, 2010. (Tr. at 20.) At step two, the ALJ concluded that Plaintiff had the following severe impairments: "plantar warts; degenerative disc disease; hip pain; and history of cirrhosis and emphysema." (*Id.*) At step three, the ALJ found that Plaintiff's combination of impairments did not meet or equal one of the listings in the regulations. (Tr. at 24.) At step four, the ALJ found that Plaintiff was unable to perform any past relevant work. (Tr. at 71.) The ALJ also found that Plaintiff was forty-nine years old on the application date, which put him in the "younger age" category. (Tr. at 22.) *See* 20 C.F.R. §416.963. (*Id.*) At step five, the ALJ found that Plaintiff could perform a limited range of light work in jobs existing in significant numbers in the regional economy. (Tr. 24-29.)

### E.    Administrative Record

The medical records begin with a single MRI report from November 30, 2001 examining possible lumbar radiculopathy. (Tr. at 387.) Plaintiff complained of sharp, burning pain radiating through both legs. (*Id.*) The radiologist reviewed the MRI, found everything was normal, and concluded that there was "no evidence of lumbar or lumbosacral disc herniation or spinal stenosis." (*Id.*)

The record then jumps to a CT scan report on January 17, 2006, taken after Plaintiff experienced headaches for one week, followed by a night of nosebleeds. (Tr. at 385.) His brain was fine, without hemorrhage, midline shift, mass effect, edema, or abnormally sized ventricles. (*Id.*) Aside from "[m]ild chronic sinusitis in the left sphenoid," the scan was "negative." (*Id.*)

On March 30, 2006, Plaintiff discussed his high blood pressure and plantar warts with Dr. Rosemarie Tolson. (Tr. at 557.) She noted "it ha[d] been a long time since he has been in," and she indicated that in the past he had low back pain. (*Id.*) "[H]e smokes about 1/3 pack a day. He drinks a few drinks a week. No illicit drug use," she noted. (*Id.*) He often forgot to take his nighttime dose of medications. (*Id.*) Dr. Tolson asked him to try over-the-counter medications for the plantar warts before returning. (*Id.*)

Plaintiff visited the emergency room on January 17, 2006, complaining of a headache, intermittent nosebleed, cough, and nasal congestion. (Tr. at 437.) He did not feel weak, numb, or tingling, and he had no hearing, vision, or speech problems. (*Id.*) Nor had he suffered trauma to his head. (*Id.*) The report notes his medical history "is remarkable for . . . hypertension." (*Id.*) He smoked about three packs of cigarettes per week. (*Id.*)

Dr. David Remmler observed that Plaintiff appeared alert and oriented, his head was atraumatic and normal, and all other signs were unremarkable. (Tr. at 438.) The CT scan showed "mild, chronic sphenoid sinusitis," but no intracranial pathology, and other laboratory results returned normal. (Tr. at 439.) He received Toradol, which helped the pain, Afrin nasal decongestant spray for right anterior epistaxis related to a respiratory tract infection, and also vicodin. (*Id.*)

Plaintiff returned to the emergency room on June 23, 2006 after falling from a ladder and landing on his left arm, possibly hitting his head. (Tr. at 429.) His neck had "some mild diffuse cervical spine tenderness." (Tr. at 430.) His right heel, wrist, and knee were tender, as well as his left fibula. (*Id.*) A CT scan of his cervical spine revealed "minimal degenerative changes." (Tr. at 430-31.) There were "[c]hronic appearing deformities" in his orbital walls, likely reflecting

8

"remote trauma," and chronic obstructive pulmonary disease in his lung apices. (Tr. at 383-84.) Fortunately, there was no "acute head trauma," evidence of brain hemorrhage or contusion, or cervical fracture. (Tr. at 384.)

His visibly deformed left wrist was his significant injury from the fall. (*Id.*) X-rays showed a left-wrist fracture, but Plaintiff's radial pulse in his left arm was "good" and Dr. Remmler, again the attending physician, decided to discharge him with a prescription for Vicodin and instructions to follow-up with his physician, who had treated previous left-wrist issues. (Tr. at 431.) Also, Dr. Remmler wrote that Plaintiff could not return to work "until cleared by orthopedic." (Tr. at 432.) Later that week, another physician referred him for a left radius open reduction internal fixation procedure and a carpal tunnel release procedure. (Tr. at 428.)

Dr. Ryan Beekman performed the procedures on June 30, 2006. (Tr. at 378.) The postoperative diagnosis listed displaced left distal radius and acute carpal tunnel syndrome ("CTS"). (*Id.*) The history included in the operation notes mentions a 2005 left wrist fracture that left partial deformities in his wrist. (*Id.*) Also, Dr. Beekman told Plaintiff, the CTS "ha[d] been present for a number of days . . . ." (Tr. at 379.)

On July 1, 2006, Plaintiff went to the emergency room with chest pain, which he rated at level three out of five on a visual analog ("VA") scale. (Tr. at 420.) He reported various symptoms, including vomiting, nausea, chills, and shortness of breath; Dr. Noel Lucas confirmed the vomiting but noted it did not contain blood. (*Id.*) Plaintiff informed the physician that on the previous day he had surgery on his left wrist. (*Id.*) He also indicated that he had not seen his primary care physician for two years. (*Id.*) Dr. Lucas wrote that Plaintiff smoked, drank alcohol on the weekends, had a history of intravenous drug abuse, and had used cocaine two days prior. (Tr. at

9

421.) All other observations and laboratory results came back normal, and Plaintiff's muscle strength was intact, though his deep tendon reflexes were "2/4 throughout." (Tr. at 422.) Dr. Lucas diagnosed atypical chest pain, hypertension, drug and tobacco abuse, leukocytosis,[3] and normocytic, normochromic anemia;[4] the last two were most likely from the recent surgery. (*Id.*) Subsequent chest examinations failed to uncover any abnormalities. (Tr. at 424-26.)

Three days later, Plaintiff was back in the emergency room feeling faint and experiencing nausea. (Tr. at 415, 547.) Dr. Mark Sochor copied Plaintiff's medication list: he was taking an antibiotic, a hypertension medication, Percodan, Oxycotin, and a high blood pressure medication. (*Id.*) The chest pain had ceased, he had no fever or chills, his gait was normal, and the examination and electrocardiogram were unremarkable. (Tr. at 415-16, 547-48.) Dr. Sochor suggested the medications could have caused the symptoms, "giving him gastritis." (Tr. at 416, 548.) Plaintiff's energy improved and the physician sent him home with "a GI cocktail, Zofran, some IV fluids and some Toradol." (Tr. at 417.)

Dr. Tolson examined Plaintiff on July 10, 2006. (Tr. at 545.) She wrote, "he is complaining of a lot of right knee pain especially outside of the knee as well as foot pain mainly [on] the sole of the foot, but [he] cannot be more specific than that." (*Id.*) When asked about illicit drug use, he admitted to smoking marijuana, but denied taking intravenous drugs. (*Id.*) He no longer used Oxycontin and only took Percodan "maybe once every other day." (*Id.*) His legs were tender but

---

[3] "Leukocytosis, or an elevation of the [white blood cell] count, is a commonly encountered laboratory finding." Tracy I. George, *Malignant or Benign Leukocystosis*, *in* Hermatology 2012, 475 (Amer. Soc. Of Hematology 2012), *available at* http://asheducationbook.hematologylibrary.org/content /2012/1.toc (scroll to "Pearls and Pitfalls in the Hematology Lab: Updates on Cellular Diagnostics" and click on "Full Text" underneath author's name).

[4] Normocytic and normochromic anemia are, respectively, types of anemia in which the erythrocytes are of normal size and the hemoglobin content of the red blood cell is normal. *Blakiston's Gould Medical Dictionary* 922 (4th ed. 1979).

all other observations were normal. (*Id.*) Dr. Tolson wrote him prescriptions for Naprosyn, a pain

killer, and Prilosec, to deal with possible gastroesophageal reflux disease. (*Id.*)

Plaintiff saw Dr. Tolson again on August 3, 2006, regarding various issues. (Tr. at 543.)

Occupational therapy sessions had begun, he stated, to help his left arm recover. (*Id.*) He stopped

taking pain pills, he informed her, because they could be addicting. (*Id.*) A rash had formed on his

chest a few months ago that Dr. Tolson thought "look[ed] like tinea corporus" and could be treated

with Lamisil. (*Id.*) He also said he was "having difficulty remembering his night time dose" of

lisinopril HCT, his blood pressure medication. (*Id.*) An electrocardiogram "came back essentially

normal." (*Id.*)

Plaintiff saw Dr. Tolson's physician assistant, Barry Myers, on August 24, 2006 for his

chest pain. He had "some tenderness in the midaxillary line on the left side of the chest." (Tr. at

541.) As with the other appointments, nothing stood out as abnormal. (*Id.*) Plaintiff was given

samples of Celebrex but no follow-up was planned. (*Id.*)

Plaintiff returned to Dr. Tolson on February 5, 2007. (Tr. at 539.) She reported that

> [h]e was supposed to come back in September and never did. He had an appointment
> in December but did not show. He comes back in today stating he stopped all of his
> medications. He states he just does not do a good job remembering and he thinks
> that they are not very important.

(*Id.*) His nose periodically bled and he experienced "bilateral hip, knee, ankle and foot pain." (*Id.*)

His other medical readings and examination results remained normal and he informed her that he

stopped smoking. (*Id.*) Dr. Tolson requested he go back on lisinopril HCT and told him that his

left leg pain "most likely . . . is arthritis because he has arthritis already diagnosed in his shoulders

and he agrees just to continue treating it as he has been." (*Id.*)

11

One month later, on March 5, Plaintiff had a check-up appointment with Dr. Tolson. (Tr. at 538.) He had followed her advice and begun taking lisinopril HCT, but his prescription ran out before he could schedule another appointment for a refill. (*Id.*) She refilled his prescription and recommended he take Aspirin. (*Id.*)

He came back two weeks later for a blood pressure check, but then missed his next appointment and did not see her again until October 22, 2007. (Tr. at 536-37.) On that date arrived complaining of flu-like symptoms, which had caused him to miss work the prior week. (Tr. at 536.) Dr. Tolson noted, "I did send him back to work tomorrow" and told him to call her office "if he cannot continue to work." (*Id.*) During the visit he admitted that "[h]e stopped his blood pressure medication on his own." (*Id.*) "Has not followed up as directed," Dr. Tolson added. (*Id.*)

He again failed to show for an appointment with Dr. Tolson on February 27, 2008, although he saw her the next day. (Tr. at 532-33.) He described "dizzy spells where he felt imbalanced and got light headed. He state[d] the first episode he was bending over doing some drywall that was low and then when he stood up he stumbled. It only lasted a few seconds" and had only occurred a few times. (Tr. at 532.) He also admitted, again, that he quit taking his blood pressure medication "for several weeks," but he had taken it for two to three weeks prior to the appointment. (*Id.*) All of Dr. Tolson's observations were normal, and even his blood pressure "well controlled." (*Id.*) However, the examination confirmed that he had orthostatic hypotension, a potentially "long-term problem" that, she informed him, required consistent use of his medication. (*Id.*) His stress had increased recently due to his return to work, but he stated he was functioning well. (*Id.*)

On May 20, 2008, Plaintiff went to the emergency room after he began coughing up small amounts of blood. (Tr. at 479.) The coughing hurt his chest, but there was no chest pain upon

exertion. (*Id.*) The report states that he was alert and oriented; his skin was normal; his gait was steady; his chest was not tender; CT scans and x-rays were normal; he was not in "acute respiratory distress"; his respirations were not labored; and his "breath sounds [were] normal except for a slight wheeze heard sporadically." (Tr. 478-80.) He stated that he smoked one-third of a pack of cigarettes per day. (Tr. at 479.) The physician diagnosed chronic obstructive pulmonary disease and discharged Plaintiff, who admitted to feeling better, "with a cough suppressant, inhaler, and short course of steroids." (Tr. at 480.)

Plaintiff was back in the emergency room complaining of dizziness and increased blood pressure on July 22, 2008. (Tr. at 499.) The symptoms began that morning when he was cutting wood with a mitre saw in a warm room. (*Id.*) He had once again stopped taking blood pressure medicine "because he was feeling better and his blood pressure was under better control after" he started dieting and exercising, though he was now smoking again. (*Id.*) His dizziness ceased while in the hospital, his blood pressure normalized, all examinations and tests came back normal, he felt better, and the physician sent him home with blood pressure medication. (Tr. at 500-01.)

Plaintiff visited physician's assistant Patrick Hite on October 28, 2009. (Tr. at 337.) This was the first of many consultations in 2009 and 2010, conducted for various reasons. (Tr. at 315-38.) His hypertension bothered him, his legs cramped, and his neck was stiff. (Tr. at 337.) His hypertension medications ran out a few weeks prior to the appointment. (*Id.*) The physical examination, like all others Plaintiff had, did not show any abnormalities. (Tr. at 337-38.) Mr. Hite planned to have Plaintiff obtain more prescriptions and also gave him stretching and mobility exercises. (Tr. at 338.)

Plaintiff complained of the flu, eczema, and nasal congestion during the next three visits in November 2009; Mr. Hite observed the nasal congestion, mild eczema on his left hand, abdominal tenderness, right elbow tenderness, and clubbing on his fingers. (Tr. at 330-36.) Mr. Hite wrote that Plaintiff's hypertension had improved, his eczema was well controlled, and there were no other abnormalities. (*Id.*)

Plaintiff began experiencing lower abdominal pain and rectal bleeding in late 2009. (Tr. at 488-92.) He went to the emergency room on November 16, 2009 after experiencing one week of these symptoms. (Tr. at 494.) The examination confirmed the rectal bleeding; mild abdominal tenderness was also noted, but this ended after a few hours. (Tr. at 495.)

He saw Dr. Ivan Cubas regarding the stomach and rectal issues, informing him on the first visit that he was not on a diet, he smoked a half of a pack of cigarettes per day, drank only on the weekends, and did not have chest pain or shortness of breath. (Tr. at 491-92.) Dr. Cubas performed an outpatient colonoscopy on Plaintiff in December 2009, finding grade-two internal hemorrhoids. (Tr. at 488.) He recommended a cream to be used as needed. (Tr. at 489.)

On January 1, 2010, Plaintiff fell on ice while drinking alcohol. (Tr. at 299.) Alleging this caused a back injury, an ambulance rushed Plaintiff to the emergency room at Allegiance Health Emergency Care. (*Id.*) Once there, however, the staff could not assess his vitals, review his systems, or obtain his medical history because he was "being uncooperative and verbally abusive to [the] staff . . . ." (*Id.*) Security monitored the room. (*Id.*) When staff members returned, they could see he had adequate breathing and movement with his extremities–in fact they found he had adequate strength and full range of motion, no "areas of bony point tenderness" in his back; and only mild to moderate lumbosacral spasms in his lower back. (*Id.*) Throughout the efforts to

14

examine him, the report states that he cursed; tried to remove his neck brace; "implor[ed] staff" members to perform sexual acts; urinated on the floor; and threatened the staff. (Tr. at 299-300.) He finally quieted down a few hours later, napped, and then demanded to leave. (*Id.*) Imaging and x-ray results found no evidence of injuries. (Tr. at 300-02.) The hospital discharged him that night and paid for his cab ride home. (Tr. at 302.)

Plaintiff next visited Mr. Hite on February 2, 2010, after he started experiencing back spasms. (Tr. at 327.) Movement produced severe pain and made sleep difficult, though over-the-counter medicines relieved the pain. (*Id.*) His gait remained unaffected, however, and respiratory issues and abdominal pain no longer troubled him. (Tr. at 327-28.) Mr. Hite assessed myalgia, myositis, and lumbago. (Tr. at 328.) The only difference in Mr. Hite's next set of notes, from March 15, 2010, is that motion now caused only moderate pain and the symptoms were "somewhat controlled with Ultram and Flexeril." (Tr. at 324.)

X-rays of the lumbosacral spine taken that month by Dr. Bhaskar Shenai displayed a "[s]mall marginal spur" at L2 but no other issues. (Tr. at 264-65.) Dr. Shenai also took x-rays of the thoracic spine, which showed proper vertebrae alignment and no compression deformities, though Plaintiff had moderate degenerative changes with spurring in the lower thoracic spine. (Tr. at 266-67.) A few weeks later, on April 5, Plaintiff reported to Mr. Hite that his back pain had improved and that he now wanted help, and perhaps medications, to quit smoking. (Tr. at 321.)

Plaintiff's next trip to the emergency room at Allegiance was on June 25, 2010. (Tr. at 281.) "[H]e was horsing around with his stepson yesterday," he said, and somehow "fell off his chair," hit his head on the hardwood floor," and blacked out. (*Id.*) "[A]lcohol was also involved." (*Id.*) In

15

addition, he reported a headache and shoulder, neck, and chest pain.[5] (*Id.*) The notes state he had short term memory loss, but no other symptoms–he denied, among other things, losing strength or sensation, struggling to walk or talk, and having fever, chills or a cough. (*Id.*) His spine, neck, right shoulder, and sternum were tender. (Tr. at 282.) The physical examination, CT scans, and x-rays all showed normal findings. (Tr. at 282-83.) Plaintiff walked "without difficulty" and was discharged three hours after arrival. (Tr. at 282.)

Three days later, Plaintiff returned to Allegiance. (Tr. at 270.) He claimed to have slipped on a leak from a small refrigerator, suffered a concussion, vomited once several days later, and lacked "his usual appetite."[6] (Tr. at 270-71.) He also had a mild, and improving, headache; he "denie[d] any weakness, numbness, blurred vision . . . neck pain, or neck sickness." (Tr. at 271.) He explained to the staff that he abstained from tobacco, alcohol, and drugs. (*Id.*) Further, he said he was married and employed. (*Id.*) The physical examination found nothing wrong with him; he had no tenderness, edema, sensory deficits, and he had full range of motion. (Tr. at 271-72.) None of the laboratory results were flagged and the hospital discharged him a few hours later. (Tr. at 273-75.)

Plaintiff's next appointment with Mr. Hite, on July 26, 2010, dealt with plantar warts on the bottom of his left foot. (Tr. at 318-20.) It caused chronic pain while walking, he stated, but Mr. Hite observed that his gait was undisturbed. (Tr. at 318-19.) One month later, on August 29, Plaintiff saw Dr. Walter Korytowsky for treatment of the warts. (Tr. at 312.) Dr. Korytowsky

---

[5] The lines following this one in the report, and supposedly written by the same person at the same time, stated that Plaintiff did not lose consciousness or have a headache. (*Id.*)

[6] He appears to refer to the same concussion that led him to the emergency room three days prior; his explanation for it, however, had changed. (Tr. at 281.)

"would not do surgery on feet with such large warts," so he froze them with liquid nitrogen and told Plaintiff to seek laser surgery "if all else fails." (*Id.*)

On October 1, 2010, Mr. Hite examined Plaintiff for hand numbness, leg pain, and plantar warts. (Tr. at 315, 591.) Apparently, Plaintiff had visited Dr. Korytowsky again after August for a second treatment, which failed; Plaintiff said surgery was the next step.[7] (*Id.*) Plaintiff also informed him that he stopped taking his blood pressure medication: he thought he might have another prescription "for cholesterol but due to his disability he could not get to the lab for blood work. [Plaintiff] felt that there was no reason to take [the] cholesterol med[ication] if he could not make it to the lab." (*Id.*) Aside from mild spinal pain and tenderness with motion, and mild numbness in his fingers, Plaintiff's condition was the same as it was during his previous visit. (Tr. at 315-16, 591-92.)

Dr. Bharti Sachdev performed a consultative examination for the Disability Determination Service on November 2, 2010. (Tr. at 339.) Plaintiff had four complaints: (1) "increasing lower back pain for eight years"; (2) plantar warts that prevented him from walking; (3) cirrhosis of the liver, diagnosed fifteen years ago; and (4) emphysema, diagnosed four to five years ago. (*Id.*) He told Dr. Sachdev that he quit working in 2009 due to back and left foot pain. (*Id.*) The back pain rated at level seven out of ten on a VA scale. (*Id.*) His knees and calves ached, and his left foot pain was "moderately severe and does not allow him to walk." (*Id.*) As a result, he "trie[d] to use a cane" to ease the pain. (*Id.*) He still smoked, which he said caused a persistent cough with wheezing, but "[h]e [was] not sure what makes him short of breath." (*Id.*) He denied having

_____

[7] Illegible notes from Dr. Korytowsky appear in the record, possibly containing a description of the second treatment. (Tr. at 413-14.)

headaches or dizziness. (*Id.*) He claimed to have had carpal tunnel surgery in 2006 on his left hand. (Tr. at 340.)

Dr. Sachdev's physical examination found the following results: Plaintiff's blood pressure was 142/102; he normal abdominal and cardiovascular readings, and vital signs; Plaintiff "could bend fairly well and [his] range of motion [was] normal"; his knees had normal range of motion and no crepitus; his left foot had dry skin and corns, but Dr. Sachdev did not find plantar warts; his joints were normal; his reflexes, muscle tone, and strength were all normal; and he walked with a cane and a limp. (*Id.*) Dr. Sachdev concluded that Plaintiff had normal spinal mobility, possible restless leg syndrome, a "[h]istory of chronic alcoholism and cirrhosis which seems to be clinically stable and well compensated liver disease," nicotine addiction, and hypertension. (Tr. at 341.)

On December 12, 2010, Plaintiff went to Allegiance's emergency room "after having an episode of syncope,"[8] or fainting, and possible seizures. (Tr. at 344.) All tests and observations failed to find anything wrong with Plaintiff. (Tr. at 344-45.) The physician prescribed Keppra, and the treatment notes indicate that outpatient physical and occupational therapy were recommended. (*Id.*) Plaintiff also continued his complaints of back and leg pain, but the hospital told him to consult his primary care physician. (Tr. at 345.) When Mr. Hite examined him later that month, Plaintiff said he had not experienced any seizures since he went to the emergency room. (Tr. at 586.)

Plaintiff visited Mr. Hite on January 13, 2011 complaining of mild to moderate right wrist pain, that was aggravated by movement but relieved by pain medications, over-the-counter

---

[8] Syncope is a "sudden brief loss of consciousness, with loss of postural tone." Mark H. Beers & Robert Berkow, eds., *The Merck Manual of Diagnosis and Therapy* 1651 (17th ed. 1999).

medicines, and rest. (Tr. at 582.) The examination, as usual, found no abnormalities with walking or breathing; the only remark indicating an issue was Mr. Hite's observation of "mildly reduced range of motion" in the right wrist. (Tr. at 583.) Mr. Hite assessed CTS. (*Id.*) However, Plaintiff's hypertension remained "controlled" through July. (Tr. at 569, 582.)

Mr. Hite examined Plaintiff again on April 19, 2011. (Tr. 578.) Plaintiff thought he was "having seizures while sleeping" because his girlfriend witnessed him shaking at night and he was tired during the day. (*Id.*) Plaintiff had the Keppra prescription from the emergency room physician, but he "sometimes misse[d] [the] second dose at night . . . ." (*Id.*) No other changes were noted. (*Id.*)

Plaintiff had an appointment with Dr. Iman Abou-Chakra on May 9, 2011 concerning his lower back pain. (Tr. at 572-74.) Dr. Chakra reported Plaintiff's "long-standing history of low back pain[] started in . . . early 2000[,] with a normal MRI in 2001," and no recent MRIs. (Tr. at 572.) The pain devolved into a alternative episodes of burning, tingling, and numbness spreading to his ankles and feet. (Tr. at 572.) He smoked two packs of cigarettes per day and had stopped using drugs and alcohol. (Tr. at 573.) On a VA scale, he registered the pain at level five at best, level nine at worst. (*Id.*) Dr. Abou-Chakra observed that Plaintiff's lower back had "limitation to [its] range of motion," and was tender, with spasms. (*Id.*) The neurotension test was negative on the right and "mildly positive on the left," and he had "mild tenderness over his right sacroiliac joint with positive spring test, decreased spring and increased pain." (*Id.*) His extremities had normal range of motion, he walked on his toes and heels, his balance was slightly off but he had normal gait and reflexes. (*Id.*) Dr. Abou-Chakra suspected disc disease and diagnosed mild left leg radiculitis and right sacroiliac joint pain. (Tr. at 574.) He prescribed Flexeril, recommended an

19

over-the-counter anti-inflammatory, and referred Plaintiff to physical therapy. (*Id.*) He also ordered

an MRI, (*Id.*), which the radiologist later described as "unremarkable" (Tr. at 395-96.)

Plaintiff participated in three physical therapy sessions in May 2011. (Tr. at 389-408.) The

therapist believed Plaintiff had good rehabilitation potential. (*Id.*) The notes contain a functional

limitations list, though the source of the information appears to be Plaintiff rather than the

therapist's objective observations. (Tr. at 402.) Plaintiff could walk four to five blocks, stand for

ten minutes, and lift twenty pounds. (*Id.*) At the end of the sessions, Plaintiff continued to report

pain[9] but his lumbar flexibility had improved. (Tr. at 390.)

Plaintiff injured his right elbow in a fall on July 29, 2011, rushed to the emergency room

where he was triaged as a non-urgent patient. (Tr. at 526.) The elbow was not numb, the triaging

staff member saw no apparent injury or local tenderness. (*Id.*) Plaintiff's elbow movements were

difficult, with "mild to moderate" pain. (Tr. at 527.) The consulting physician recommended

"conservative care and smoking cessation." (*Id.*) His color was good and his strength

"commensurate with [his] habitus." (*Id.*) The x-ray showed some "[d]egenerative changes and

probably old trauma," but "no acute abnormality." (Tr. at 568.) Mr. Hite's musculoskeletal

examination a few days later revealed tenderness in the right elbow and "mild pain" with motion.

(Tr. at 565.) Plaintiff also received a new referral for physical therapy. (*Id.*)

The therapy session began on August 24, 2011, focusing on his lower back pain, which he

rated at level four on the VA scale. (Tr. at 507.) A functional limitations check list, likely from

Plaintiff's complaints rather than the therapist's observations, now put his lifting limit at three to

four pounds. (*Id.*) He ambulated independently, without assistive devices and his balance was

---

[9] Mr. Hite noted lower-back muscle spasms and "mild pain" with motion in July. (Tr. at 570.)

normal. (Tr. at 508.) He could transfer from sitting to standing and floor to standing without assistance. (*Id.*) Occasionally his hands and feet had poor sensation, but they were otherwise normal. (*Id.*) The next session notes state that Plaintiff did not return for continued therapy, and he was discharged at that time. (Tr. at 512.)

In October 2011, Plaintiff walked into the emergency room with a broken toe on his left foot. (Tr. at 516-19.) Two days earlier, "a weight fell on his foot while he was trying to swat a fly at home." (Tr. at 517.) He denied any difficulty walking or strength loss. (*Id.*)

Plaintiff had x-rays and MRIs taken of his back in December 2011 and January 2012. (Tr. 598-606.) Plaintiff fell on ice in December and hit his head; but the MRI indicated no abnormalities relating to the injury. (Tr. at 598.) His right hip hurt too, and an MRI ruled out any fractures or dislocations, but suggested "femoral acetabular impingement bilaterally with degenerative changes of both hips." (Tr. at 599.) The MRI of the lumbosacral spine showed no fractures, but the radiologist observed "mild multilevel facet arthropathy of the lower lumbar spine" and "mild disc space narrowing and anterior spurring" at multiple levels. (Tr. at 600.) The neck MRI displayed, at various disc levels, mild cervical spondylosis, "some encroachment upon the right neuroforamina," mild bulging disc, and mild disc protrusion. (Tr. at 601-02.) The January 2012 lumbar MRI found normal disc alignment, normal disc heights, normal disc signals, and no spondylolysis, listhesis, disc herniation, or nerve root compression. (Tr. at 603-04.) The thoracic MRI on the same day showed mild spondylitic spurring, but no evidence of disc herniation, central canal stenosis, or neural foraminal encroachment. (Tr. at 605.)

Plaintiff's last recorded visit with Mr. Hite was on December 9, 2011, after his fall on the ice. (Tr. at 560.) Mr. Hite did not observe abdominal pain or gait disturbance, but he did note

tenderness and moderate pain with motion in Plaintiff's lumbar spine and hips and diagnosed lumbago and hip deformity. (Tr. at 560-61.)

Mr. Hite filled out a functional assessment form on December 12, 2011. (Tr. at 594-97.) In it, he described Plaintiff's pain and the results from accompanying objective tests; he also mentioned that Plaintiff's occasional use of Vicodin precluded driving and operating equipment. (Tr. at 594.) He wrote that it was "unknown" whether Plaintiff was a malingerer, and estimated that in a competitive work environment Plaintiff would "[s]eldom" be off task, meaning up to twenty-five percent of the time. (Tr. at 594-95.) He did not know how far Plaintiff could walk without rest, but he estimated Plaintiff could sit or stand continuously for ninety minutes and, in an eight hour workday, could sit and "[s]tand/walk" each for two hours." (Tr. at 595.) Plaintiff would need to walk four times for five minutes each workday, but did not need a position allowing him to switch at will between standing, sitting, and walking, and he did not need unscheduled breaks, periods of leg elevation, or an assistive device to walk. (Tr. at 595-96) He could frequently lift up to ten pounds and occasionally lift twenty pounds. (Tr. at 596.)

In his pre-hearing materials, Plaintiff submitted Lisa Hicks's affidavit supporting his claim. (Tr. 223-24.) Ms. Hicks was Plaintiff's friend; they met three or four times per month and frequently spoke on the telephone. (Tr. at 223.) She stated he had trouble standing, walking, dressing, and sleeping. (Tr. at 223-24.) His weak legs caused frequent falls and while he did light housework, he could not shop at stores. (Tr. at 224.) Additionally, he had seizures during the night. (Tr. at 223.) She concluded that he could not work. (Tr. at 224.)

At the hearing, Plaintiff testified that he worked in security full-time until 1999. (Tr. at 45-46.) The ALJ then asked about Plaintiff's sources of income over the past few years. (Tr. at 46-47.)

22

Plaintiff said he did more work than the earnings records indicated, and over the past two years attempted to start a business, the nature of which is unclear but it involved "the same type of . . . physical stuff" he performed as a painter and carpenter. (Tr. at 48-49.) At first, Plaintiff admitted, he tried to "do the physical stuff," but he often dropped tools and fell, so he began looking for "light" tasks instead. (Tr. at 49.) The ALJ asked if he had, or could have, worked full-time since 2006, to which Plaintiff responded, "[n]ot really, no." (Tr. at 50.) Later, the ALJ returned to the topic, asking Plaintiff how long he had survived on food stamps. (Tr. at 65-66.) Plaintiff estimated he had lived that way for three years and said he did not do "odd jobs," apply for work, or earn income from anything else. (Tr. at 66.)

The ALJ then asked about specific impairments. Plaintiff had lost over fifty pounds recently and said he would probably "feel a little better" if he lost more, but that it was difficult to do with his lack of activity. (Tr. at 50-51.) Plaintiff stated he smoked for thirty-three years, and he still smoked occasionally. (Tr. at 51-52.) He was diagnosed with emphysema four years prior to the hearing. (Tr. at 53.)

Plaintiff brought a cane to the hearing, which he showed the ALJ, and said he used it for the past year, at first because of his warts but later he found it helped his back and hips as well. (Tr. at 53-54.) At the time of the hearing, Plaintiff was attempting to change insurance so that he could have surgery on the warts. (Tr. at 54.) The ALJ asked how the warts affected his work over the past few years; Plaintiff responded that back and hip pain were the primary reasons he could not work, and that he dealt with those for ten years. (Tr. at 55.)

23

He testified that Mr. Hite had told him just a week prior that he would need hip and back surgery in the future.[10] (Tr. at 58.) But he also stated, "really I don't feel that Dr. Height [sic] is really helping me that much. . . . So I'm thinking about switching doctor[s] anyway." (*Id.*) Plaintiff then discussed his recent MRIs and CT scans, stating that "they said that it's probably a good chance that both of my hips are going to have to be replaced." (Tr. at 60.) His hip bothered him at the hearing: it felt like he was sitting on a wallet. (Tr. at 62-63.)

The ALJ also asked about Plaintiff's criminal history–he had been in jail a few times–and drug and substance abuse problems. (Tr. at 56-57.) He was never arrested for drugs, and he stopped using them a few years ago; he now only occasionally drank alcohol. (Tr. at 57.)

Plaintiff testified to limited daily activities. (Tr. at 63-64.) When he endeavored to do laundry he would "put a few items in a plastic bag," probably less than a full load, "and let them roll down the steps" and then he "dragged it back to the laundry room." (Tr. at 64.) He lived upstairs but sometimes slept on the first floor if he did not "feel like walking up stairs." (Tr. at 65.)

Plaintiff doubted he could be gainfully employed. (Tr. at 66-67.) He could not, without pain, work as a silverware wrapper at a restaurant, even with the option to sit or stand at will. (*Id.*) He explained that his medications made him dizzy, forgetful, and "a little confused at times," suggesting this would prevent him from working. (Tr. at 67.) The Keppra had not stopped the seizures; he had three in the past month. (Tr. at 67-68.) A few of the medications made him tired and, he needed to nap during the day. (Tr. at 68-69.)

---

[10] Plaintiff was likely referring to his appointment with Mr. Hite on December 9; the session notes make no mention of surgery and, in fact, he had no gait disturbances during the session. (Tr. at 560-61.)

24

Asked about Mr. Hite's functional capacity report, Plaintiff said he was not capable of performing at those levels. (Tr. at 69-70.) Specifically, he could not walk more than one or two blocks and he had no opinion on whether he needed an option to sit or stand at will. (Tr. 70-72.) He shifted in his chair at home, periodically standing up to walk. (Tr. at 72.)

Plaintiff's attorney then took over the questioning. (*Id.*) Plaintiff's worst pain was in his neck, back, and hips; "[n]ow that it's cold," Plaintiff stated, those areas hurt "daily." (*Id.*) His pain reached level ten, but at the time of the hearing it was at six or seven. (Tr. at 73.) Elevating his legs in a reclined position sometimes decreased the pain. (*Id.*) Back spasms and pain interrupted his sleep five or six nights per week, waking him once or twice each night. (Tr. at 74.) Finally, Plaintiff said he thought ten pounds was the most he could lift, but "[f]or the most part" he did not lift any weight. (Tr. at 75.)

The VE then classified Plaintiff's prior positions as security guard and painter and described their relevant vocational characteristics. (Tr. at 76.) The ALJ then asked the VE to assume an individual with Plaintiff's background

> who will be able to work at the light exertional level. However, he could never climb ladders, ropes, or scaffold[s], only occasional ramps or stairs, occasional balance. Only frequent as opposed to constant bilateral handling of objects, avoid concentrated exposure to excessive vibration. Avoid even moderate exposure to environmental irritants and poorly ventilated areas, avoid all use of moving machinery, all exposure to unprotected heights.

(Tr. at 76-77.) "Could an individual with these limitations perform claimant's past work as it was actually performed or generally performed per the [Dictionary of Occupational Titles]," the ALJ asked. (Tr. at 77.) The VE replied that such a person could perform the security guard position, both as Plaintiff performed it and as generally performed. (*Id.*) Additionally, there were other light, unskilled occupations in Michigan that the individual could perform, including office clerk (7,022

25

positions in Michigan), courier and messenger (2,809 positions in Michigan), and parking lot attendant (1,381 positions in Michigan). (Tr. at 78.) If the individual needed to lie down for two hours in an eight-hour workday, the VE testified that he could not perform any competitive employment. (Tr. at 78.) The ALJ then took the first hypothetical and added a sit and stand at-will option and limited his time off task to ten percent. (Tr. at 79.) He would no longer be able to do Plaintiff's past work, but could work as an office clerk (reduced to 2,000 positions in Michigan), a courier and messenger (reduced to 1,000 positions), and a parking lot attendant (reduced to 1,000 positions in Michigan). (Tr. at 79-80.)

Plaintiff's attorney then asked how a three to four pound lifting limit affected the analysis. (Tr. at 80.) The VE thought it would render the number of jobs available to below a reasonable amount, if it left any at all. (*Id.*) Nor would any jobs remain if Plaintiff was off task twenty-five percent of the time. (Tr. at 80-81.) Finally, limiting him to four hours of sitting, standing, and walking during the workday would preclude employment "[if] it interferes with the time on task issues . . . ." (Tr. at 81.)

### F.    Analysis and Conclusions

### 1.    Legal Standards

The ALJ determined that during the time Plaintiff qualified for benefits, he had the residual functional capacity ("RFC") to perform a limited range of light work:

> [T]he claimant has the residual functional capacity to perform light work as defined in 20 CFR 416.967(b) with a sit/stand option at will; no climbing ladders, ropes, or scaffolds; occasional climbing of ramps or stairs; frequent bilateral handling of objects; avoiding even moderate exposure to environmental irritants and poorly ventilated areas; and avoid all use of moving machinery and unprotected heights.

(Tr. at 24.) Light work

involves lifting no more than 20 pounds at a time with frequent lifting or carrying of objects weighing up to 10 pounds. Even though the weight lifted may be very little, a job is in this category when it requires a good deal of walking or standing, or when it involves sitting most of the time with some pushing and pulling of arm or leg controls. To be considered capable of performing a full or wide range of light work, you must have the ability to do substantially all of these activities. If someone can do light work, we determine that he or she can also do sedentary work, unless there are additional limiting factors such as loss of fine dexterity or inability to sit for long periods of time.

20 C.F.R. §§ 404.1567(b), 416.967(b).

After review of the record, I suggest that the ALJ utilized the proper legal standard in his application of the Commissioner's five-step disability analysis to Plaintiff's claim. I turn next to the consideration of whether substantial evidence supports the ALJ's decision.

### 2.    Substantial Evidence

Plaintiff makes three arguments he believes merit reversal or remand. (Doc. 11 at 11-22.) First, the ALJ failed to follow Social Security Ruling 96-8p by not considering all of his impairments, both severe and non-severe, when constructing the RFC. (*Id.* at 11-14.) The final two arguments appear to each claim, in essence, that the ALJ accorded improper weight to various sources. (Tr. at 13-22.)

The Court declines Defendant's invitation to cast the first argument aside as undeveloped, and instead will address the merits of all three contentions.[11] Plaintiff's claims are somewhat opaque, but not enough to justify jettisoning them without analysis. Nonetheless, all three

---

[11] Defendant supports this argument with a string cite of decisions critical of undeveloped claims. (Doc. 13 at 16 n.4.) Tucked in two parentheticals are implications, or perhaps accusations, that Plaintiff's counsel in this case was the target of the criticism in those cases: one states, "same language [asserting the argument is wholly insufficient and undeveloped], also involving a case briefed by Plaintiff's counsel"; the very next parenthetical states, "same language and counsel." *Id.* However, Plaintiff's counsel in this case is not listed in any of those cases.

27

arguments fail to persuade and I therefore recommend denying Plaintiff's motion and granting Defendant's.

### a.   Medical Sources

The ALJ must "consider all evidence" in the record when making a disability decision. 42 U.S.C. § 423(d)(5)(B); *accord* 20 C.F.R. §§ 404.1520(a)(3), 416.920(a)(3); *Wyatt*, 974 F.2d at 683. The regulations carve the evidence into various categories, but the only relevant distinction for present purposes is between "acceptable medical sources" and "other sources." 20 C.F.R. §§ 404.1513, 416.913. "Acceptable medical sources" include, among others, licensed physicians and licensed or certified psychologists. *Id.* §§ 404.1513(a), 416.913(a). "Other sources" include medical sources who are not "acceptable" and almost any other individual able to provide relevant evidence. *Id.* §§ 404.1513(d), 416.913(d). There are important differences between the two types of sources. For example, only "acceptable medical sources" can establish the existence of an impairment. SSR 06-03p, 2006 WL 2329939, at *2.

Both "acceptable" and non-acceptable sources provide evidence to the Commissioner, often in the form of opinions "about the nature and severity of an individual's impairment(s), including symptoms, diagnosis and prognosis, what the individual can still do despite the impairment(s), and physical and mental restrictions." *Id.* at *2. When "acceptable medical sources" issue such opinions the regulations deem the statements to be "medical opinions" subject to a multi-factor test that weighs their value. 20 C.F.R. §§ 404.1527, 416.927. Excluded from the definition of "medical opinions" are various decisions reserved to the Commissioner, such as whether the claimant meets the statutory definition of disability and how to measure his or her residual functional capacity. *Id.* §§ 404.1527(d), 416.927(d).

The ALJ must use a six-factor balancing test to determine the probative value of medical opinions from non-treating acceptable sources, *Id.* §§ 404.1527(c), 416.927(c), and the ALJ should almost certainly use the same analysis for "other source" opinions as well. *See Cruse*, 502 F.3d at 540-42; SSR 06-3p, 2006 WL 2329939, at *2. The test looks at whether the source examined the claimant, "the length of the treatment relationship and the frequency of examination, the nature and extent of the treatment relationship, supportability of the opinion, consistency of the opinion with the record as a whole, and specialization of the treating source." *Wilson*, 378 F.3d at 544. *See also* 20 C.F.R. §§ 404.1527(c), 416.927(c).

1.    *Treating Source Opinions*

Certain opinions of a treating physician, in contrast, receive controlling weight if they are "well-supported by medically acceptable clinical and laboratory diagnostic techniques" and are "not inconsistent with the other substantial evidence in [the] case record." *Id.* §§ 404.1527(d)(2), 416.927(d)(2). *See also Wilson*, 378 F.3d at 544. The only opinions entitled to dispositive effect are those dealing with the nature and severity of the claimant's impairments. 20 C.F.R. §§ 404.1527(d), 416.927(d); SSR 96-2p, 1996 WL 374188, at *1-2. Therefore, the ALJ does not owe a treating opinion deference on matters reserved to the Commissioner. 20 C.F.R. §§ 404.1527(d), 416.927(d); SSR 96-2p, 1996 WL 374188, at *1-2. The ALJ "will not give any special significance to the source of an opinion[, including treating sources]," regarding whether a person is disabled or unable to work, whether an impairment meets or equals a Listing, the individual's residual

functional capacity ("RFC"),[12] and the application of vocational factors. 20 C.F.R. §§ 404.1527(d)(3), 416.927(d)(3).

The regulations mandate that the ALJ provide "good reasons" in the written determination for the weight assigned to the treating source's opinion. 20 C.F.R. § 404.1527(c)(2). *See also Smith v. Comm'r of Soc. Sec.*, 482 F.3d 873, 875 (6th Cir. 2007). Therefore, a decision denying benefits

> must contain specific reasons for the weight given to the treating source's medical opinion, supported by the evidence in the case record, and must be sufficiently specific to make clear to any subsequent reviewers the weight the adjudicator gave to the treating source's opinion and the reasons for that weight.

SSR 96-2p, 1996 WL 374188, at *5 (1996). *See also Rogers*, 486 F.3d at 242. "This requirement is not simply a formality; it is to safeguard the claimant's procedural rights." *Cole v. Astrue*, 661 F.3d 931, 937 (6th Cir. 2011). "[A] failure to follow the procedural requirement of identifying the reasons for discounting the opinions and for explaining precisely how those reasons affected the weight accorded the opinions denotes a lack of substantial evidence, even where the conclusion of the ALJ may be justified based upon the record." *Rogers*, 486 F.3d at 243.

Determining whether a physician is a treating source is a fact-intensive inquiry. "Acceptable medical sources" qualify as treating sources only if they are "licensed physicians" or "licensed or certified psychologists." 20 C.F.R. § 404.1513(a)(1)-(2). *See also* SSR 06-03p, 2006 WL 2329939, at *1-2. Additionally, to become a treating source, the relationship between the physician and claimant must have been "ongoing." 20 C.F.R. § 404.1502. That is, treatments or

---

[12] The Commissioner's power to determine the claimant's RFC is less capacious than it appears at first. While the ALJ determines the RFC, the ALJ might be required to give controlling weight to treating source opinions on specific limitations. *See* 20 C.F.R. §§ 404.1513(b)-(c), 416.913(b)-(c) (describing that medical reports can include a source's "statement about what [the claimant] can still do despite [her] impairments"). These opinions would necessarily affect the RFC. *See Green-Young v. Barnhart*, 335 F.3d 99, 106-07 (2d Cir. 2003) (holding that treating physician's opinion that claimant could not sit or stand for definite periods "should have been accorded controlling weight").

evaluations must have occurred "with a frequency consistent with accepted medical practice for the type of treatment and/or evaluation required for [the] medical condition(s)." *Id.* Infrequent consultations or a brief period of treatment often preclude a source from this category. *See, e.g.*, *Smith*, 482 F.3d at 876 (finding that two physicians who each treated claimant once were not treating sources).

In the Sixth Circuit, "more than one examination is required to attain treating-physician status." *Pethers v. Comm'r of Soc. Sec.*, 580 F. Supp. 2d 572, 579 n.16 (W.D. Mich. 2008). *See also Hoskins v. Comm'r of Soc. Sec.*, 106 F. App'x 412, 414-15 (6th Cir. 2004) (treating a claimant only once is insufficient for treating status); *Barker v. Shalala*, 40 F.3d 789, 794 (6th Cir. 1994) (same); *Atterberry v. Sec. of Health & Human Servs.*, 871 F.2d 567, 571 (6th Cir. 1989) (same). Moreover, "depending on the circumstances and nature of the alleged condition, two to three visits often will not suffice for an ongoing treatment relationship." *Kornecky*, 167 F. App'x at 506. *See also Helm v. Comm'r of Soc. Sec.*, 405 F. App'x 997, 1001 n.3 (6th Circ. 2011) ("[I]t is questionable whether a physician who examines a patient only three times over a four-month period is a treating source."). Finally, a physician the claimant consults only to obtain a report for her disability claim is not a treating source. 20 C.F.R. § 404.1502.

2. *Other Source Opinions*

The regulations do not prescribe any balancing or other test to weigh opinions from "other sources." SSR 06-03p, 2006 WL 2329939, at *3. This hole in the regulations left the ALJ's without an explicit framework for analyzing these opinions. The agency sought to provide clarity in a 2006 Ruling by noting that ALJs were already required to "consider" these opinions under 42 U.S.C. § 423(d)(5)(B), and suggesting that the balancing factors for "acceptable" sources "can be

31

applied to opinion evidence from 'other sources.'" *Id.* at *2, 6. However, this pronouncement adds less clarity than it would appear at first glance.

The critical question that the Ruling acknowledges, but quickly elides, is not how the ALJ must "consider" these opinions, but rather the extent to which the ALJ must explain these considerations in his or her opinion, or if they must be explained at all. *Id.* at *6. The Ruling states

> [a]lthough there is a distinction between what an adjudicator must consider and what the adjudicator must explain in the disability determination or decision, the adjudicator general should explain the weight given to opinions from these 'other sources,' or otherwise ensure that the discussion of the evidence in the determination or decision allows a claimant or subsequent reviewer to follow the adjudicator's reasoning, when such opinions may have an effect on the outcome of the case.

*Id.* In other words, the adjudicator should either include the opinion in the discussion or make certain that the discussion is well-reasoned. The latter option provides no assurance that the opinion will be explicitly addressed.

The district courts in this circuit have accordingly come to slightly different conclusions on this matter. *See, e.g.*, *Russell v. Comm'r of Soc. Sec.*, No. 1:13-CV-291, at *9 (N.D. Ohio Mar. 31, 2014) ("District courts in this circuit vary in their interpretation of whether SSR 06-03p requires an ALJ to discuss the reasons for not crediting opinions from other sources."); *Hill v. Astrue*, No. 5:12CV-00072-R, 2013 WL 3293657, at *4 (W.D. Ky. June 28, 2013) (hereinafter *Hill I*) (noting that SSR 06-03p "has generated some controversy among the courts within this Circuit as to the degree of explanation required in the ALJ's written decision"), *aff'd*, 2014 WL 1257948 (6th Cir. Mar. 27, 2014); *Southward v. Comm'r of Soc. Sec.*, No. 11-14208, 2012 WL 3887212, at *3 (E.D. Mich. Sept. 7, 2012) (same), *adopted by* 2012 WL 3887212 (E.D. Mich. Sept. 7, 2012).

One group of cases relies on a close reading of the text of the regulations and the Ruling, finding that they do not include an explicit requirement to discuss "other source" opinions. *Boyer v. Comm'r of Soc. Sec.*, No. 1:12-cv-03088, at *17 (N.D. Ohio Dec. 13, 2013) ("SSR 06-03p does not include 'an express requirement for a certain level of analysis that must be included in the decision of the ALJ regarding the weight or credibility of opinion evidence from "other sources."'" (quoting *Chambers v. Astrue*, 835 F. Supp. 2d 668, 678 (S.D. Ind. 2011))); *Southward*, 2012 WL 3887439, at *6 ("[T]he ALJ is not required to explain the weight given [an other source] opinion nor is the ALJ required to give reasons why her opinion was discounted."); *Hickox v. Comm'r of Soc. Sec.*, No. 1:09-cv-343, 2010 WL 3385528, at *7 (W.D. Mich. Aug. 2, 2010) ("SSR 06-3p does not require that an ALJ discuss opinions supplied by 'other sources' or to explain the evidentiary weight assigned thereto."), *adopted by* 2011 WL 6000829 (W.D. Mich. Nov. 30, 2011); *Ball v. Astrue*, No. 09-208-DLB, 2010 WL 551136, at *5 (E.D. Ky. Feb. 9, 2010) ("[T]he ALJ is not required to explain the weight given to the opinions of 'other sources,' or to give reasons why such opinion was discounted."); *Castle v. Astrue*, No. 08-137-GWU, 2009 WL 1158678, at *5 (E.D. Ky. Apr. 29, 2009) (noting that the Ruling and regulations are not phrased as imperatives).

Other cases come to the opposite conclusion, relying on the Sixth Circuit Court of Appeals' opinion in *Cruse v. Commissioner of Social Security*, 502 F.3d 532 (6th Cir. 2007), and a broader reading of the Ruling and regulations to find that the ALJ must discuss "other source" opinions. In *Cruse*, the court found that SSR 06-03p requires ALJ's to examine these opinions, but declined to apply the decision retroactively. *Id.* at 541-42. Many courts have followed suit. *See Dunmore v. Colvin*, 940 F. Supp. 2d 677, 685 (S.D. Ohio 2013) ("[U]nder SSR 06-03p . . . the

opinions of 'non-medical sources,'like those of 'acceptable medical sources' must be weighed and evaluated with the criteria set forth in 20 C.F.R. § 404.1527 . . . ."); *Harthun v. Comm'r of Soc. Sec.*, No. 1:07-cv-595, 2008 WL 2831808, at *7 (W.D. Mich. July 21, 2008) (recommending reversal and remand for ALJ's failure to explain why "other source" opinions were rejected) (adopting Magistrate's Report and Recommendation).

The Sixth Circuit has since reiterated the reasoning used in *Cruse*. *Hill v. Comm'r of Soc. Sec.*, 560 F. App'x 546, 2014 WL 1257948, at *2 (6th Cir. Mar. 27, 2014) (hereinafter *Hill II*) (finding that an ALJ should explain their assessment of "other sources"); *Cole*, 661 F.3d at 939-40 (finding that ALJ failed to "consider" an "other source" opinion by not mentioning it in the decision). Consequently, an ALJ should discuss these opinions, or at least provide reasoning that shows the ALJ considered the opinion's substance. Nonetheless, there is no indication that the court in *Cruse* found SSR 06-03p overturned the substantial body of case law classifying these opinions as less probative than "acceptable" sources, allowing an ALJ substantial discretion in the analysis, and absolving the ALJ from the need to discuss every piece of evidence in the record.[13]

The Commissioner and many courts note that "other sources" are generally given less weight than "acceptable" sources. *Dunmore*, 940 F. Supp. 2d. at 685 ("[T]he regulation [20 C.F.R. § 404.1513] . . . allows the ALJ to give greater weight to 'acceptable medical sources' who are

---

[13] The court in *Cruse* did imply, however, that the Ruling might create tension with a portion of this case law. Before discussing the Ruling, the court cited *Walters v. Commissioner of Social Security*, 127 F.3d 525, 530 (6th Cir. 1997), which held that an ALJ has discretion to weigh "other source" opinions. *Cruse*, 502 F.3d at 541. The court suggested that SSR 06-03p controlled the analysis, but nonetheless the court did not cast *Walters* into doubt and in fact cited the case repeatedly elsewhere in the opinion. *Id.* at 540, 542, 543. The holdings are congruous: *Cruse* found that SSR 06-03p simply mandated a discussion and provided the framework of that discussion, while *Walters* and similar cases allowed the ALJ to operate with considerable freedom inside of that framework. Many courts adhere to both bodies of case law. *See, e.g., Hogston v. Comm'r of Soc. Sec.*, No. 12-12626, 2013 WL 5423781, at *10 (E.D. Mich. Sept. 26, 2013) (noting that an ALJ must discuss "other sources," but that the discussion "need not be extensive" and can consist of a brief assessment of the reasons behind the assessment).

recognized as more-qualified healthcare professionals."); *Strevy v. Comm'r of Soc. Sec.*, No. 1:12-cv-634, 2013 WL 5442803, at *7 (W.D. Mich. Sept. 30, 2013) ("The opinions of such acceptable medical sources are entitled to greater weight than the opinion of a non-acceptable source . . . .") (adopting Magistrate's Report and Recommendation); SSR 06-03p, 2006 WL 2329939, at * 5 ("The fact that a medical opinion is from an 'acceptable medical source' is a factor that may justify giving that opinion greater weight than an opinion from a medical source who is not an 'acceptable medical source' . . . ."). Moreover, an ALJ has considerable discretion in deciding what weight to give the various factors in the analysis. *Walters v. Commissioner of Social Security*, 127 F.3d 525, 530 (6th Cir. 1997) ("[T]he ALJ has the discretion to determine the appropriate weight to accord a ["other source"] opinion based on all evidence in the record . . . ."). The ALJ is under no obligation to explain each piece of evidence in the record. *Kornecky*, 167 F. App'x at 508. In short, the ALJ is not bound by any opinion evidence, except in limited circumstances, when determining the claimant's residual functions. As the Sixth Circuit has expressed, "the ALJ is charged with the responsibility of determining the [Residual Functional Capacity] based on her evaluation of the medical and non-medical evidence" and does not have "to base her RFC finding on a physician's opinion." *Rudd v. Comm'r of Soc. Sec.*, 531 F. App'x 719, 728 (6th Cir. 2013).

### b. Plaintiff's Credibility

Finally, the social security regulations establish a two-step process for evaluating subjective symptoms, including pain. *Id.* §§ 404.1529, 416.929; SSR 96-7p, 1996 WL 374186, at *2. The ALJ evaluates complaints of disabling pain by confirming that objective medical evidence of the underlying condition exists. The ALJ then determines whether that condition could reasonably be expected to produce the alleged pain or whether other objective evidence verifies

the severity of the pain. *See* 20 C.F.R. §§ 404.1529, 416.929; SSR 96-7p, 1996 WL 374186, at *2; *Stanley v. Sec'y of Health & Human Servs.*, 39 F.3d 115, 117 (6th Cir. 1994); *Felisky*, 35 F.3d at 1038-39; *Duncan v. Sec'y of Health & Human Servs.*, 801 F.2d 847, 853 (6th Cir. 1986). Finally, the ALJ ascertains the extent of the work-related limitations by determining the intensity, persistence, and limiting effects of the claimant's symptoms. SSR 96-7p, 1996 WL 374186, at *2.

While "'objective evidence of the pain itself'" is not required, *Duncan*, 801 F.2d at 853 (quoting *Green v. Schweicker*, 749 F.2d 1066, 1071 (3d Cir. 1984)), a claimant's description of his physical or mental impairments alone is "not enough to establish that there is a physical or mental impairment," 20 C.F.R. §§ 404.1528(a), 416.928(a). Nonetheless, the ALJ may not disregard the claimant's subjective complaints about the severity and persistence of the pain simply because they lack substantiating objective evidence. SSR 96-7p, 1996 WL 374186, at *1. Instead, the absence of objective confirming evidence forces the ALJ to consider the following factors:

(I)     [D]aily activities;

(ii)    The location, duration, frequency, and intensity of . . . pain;

(iii)   Precipitating and aggravating factors;

(iv)    The type, dosage, effectiveness, and side effects of any medication . . . taken to alleviate . . . pain or other symptoms;

(v)     Treatment, other than medication, . . . received for relief of . . . pain;

(vi)    Any measures . . . used to relieve . . . pain.

(vii)   Other factors concerning . . . functional limitations and restrictions due to pain or other symptoms.

20 C.F.R. §§ 404.1529(c)(3), 416.929(c)(3); *Felisky*, 35 F.3d at 1039-40; SSR 96-7p, 1996 WL 374186, at *3. Furthermore, the claimant's work history and the consistency of the subjective

36

statements are also relevant. 20 C.F.R. §§ 404.1527(c), 416.927(c); SSR 96-7p, 1996 WL 374186, at *5.

### c.   Analysis

1.   *The ALJ Properly Considered all of Plaintiff's Symptoms*

Plaintiff alleges that the ALJ disregarded various impairments and symptoms in his analysis. (Doc. 11 at 11-12.) He points to Social Security Ruling 96-8p to ground his claim. (*Id.*) That ruling requires the ALJ to

> consider limitations and restrictions imposed by all of an individual's impairments, even those that are not 'severe.' While a 'not severe' impairment(s) standing lone may not significantly limit an individual's ability to do basic work activities, it may–when considered with limitations or restrictions due to other impairments–be critical to the outcome of a claim.

SSR 96-8p, 1996 WL 374184, at *5 (1996). The impairments the ALJ supposedly neglected include, among others, seizures, radiculitis, cirrhosis of the liver, syncope, and hemorrhoids. (Doc. 11 at 11.) Had the ALJ conducted the proper analysis, Plaintiff asserts, the RFC would have been reduced to "no more than a sedentary level" and "Rule 201.12 of the Medical-Vocational Guidelines" would have directed a finding of disabled. (*Id.* at 12.)

Plaintiff does not explain how his proposed analysis would have pushed him into the sedentary work level, thus triggering the Guidelines. Instead, following this bare assertion, he spends the final five sentences of this argument citing case law for general propositions, such as the Commissioner's duty to comply with the regulations and the need to examine the cumulative effects of all impairments. (*Id.* at 12-13.)

The ALJ did not ignore the effects of the combined impairments and symptoms. First, the ALJ stated he followed 20 C.F.R. § 416.945 and SSR 96-8p, each mandating that the RFC reflect

both severe and non-severe impairments. (Tr. at 19.) In similar contexts, the Sixth Circuit has found such statements to approach the minimum needed to satisfy the regulations. *White v. Comm'r of Soc. Sec.* 572 F.3d 272, 287 (6th Cir. 2009) ("[T]he ALJ expressly stated that she had considered S.S.R. 97-7p, which details the factors to address in assessing credibility. There is no indication that the ALJ failed to do so," and therefore the ALJ's credibility determination was upheld.) In any case, the ALJ went far beyond this simple attestation and, in fact, his discussion on severity is one of the more intricate and lengthy sections in the decision. (Tr. at 20-24.)

The ALJ did consider cirrhosis, contrary to Plaintiff's claim, and actually deemed it a severe impairment. (Tr. at 20; Doc. 11 at 11.) Plaintiff does not point to any specific instances of closed head injuries or episodes of short-term memory loss. The ALJ thoroughly explained the reports of Plaintiff's head injuries associated with his multiple slips and falls. (Tr. at 22-24.) Records from Plaintiff's fall on January 1, 2010, including a CT scan, showed no evidence of cranial damage or injury. (Tr. at 22, 300-02.) The June 25, 2010 fall similarly produced no objective proof of damage. (Tr. at 281.) The notes from that visit are one of the only instances of short-term memory loss; but they also state that alcohol was involved in the accident, which occurred on the prior day. (*Id.*) Plaintiff reported memory loss at the hearing, but hedged it with qualifiers: the medication "kind of makes me forget things sometimes." (Tr. at 66.) Yet, the medication side-effects he listed in his paperwork did not include memory loss, (Tr. at 203), and memory was not a problem listed in his self-reported functional capacity analysis, though he did state that a friend reminds him to attend doctor's appointments. (Tr. at 201.) The only subject he showed actual, rather than simply reported, forgetfulness in was his medications, (Tr. at 539); but he also seemed purposefully disinclined to take them, as when he told Mr. Hite that he "felt that

38

there was no reason to take cholesterol med[ication] if he could not make it to the lab." (Tr. at 315, 591.)

The ALJ also discussed syncope and seizures, noting Plaintiff's visit to the emergency room in December 2010. (Tr. at 22.) The doctors found no objective evidence of disorder, and sent him home with Keppra. (Tr. at 344-45.) No other fainting spells are mentioned in the Record, and the Keppra seemed to work well for the seizures. (Tr. at 586.) Plaintiff told Mr. Hite in April 2011 that he might be having seizures, though he was uncertain, and he admitted he had stopped taking Keppra. (Tr. at 578.) During the consultative examination with Dr. Abou-Chakra the next month, he reported that the "seizure disorder . . . is currently stable." (Tr. at 573.) The affidavit of Plaintiff's friend, Ms. Hicks, noted seizures, but as discussed below the ALJ appropriately gave this little weight. Finally, Plaintiff testified at the hearing that Keppra worked "from time to time," though he would "still have a seizure every once in a while." (Tr. at 67-68.) He did not say whether he took the medication consistently. (*Id.*)

Likewise, the ALJ noted Plaintiff's complaints of lower leg pain that radiated from his back. (Tr. at 23.) The objective evidence, however, did not confirm the impairment in the legs and he consistently walked with normal gait. (Tr. at 23, 327-28, 415-16, 478-80.) The pain was "somewhat controlled" with medication, according to Mr. Hite in 2010, (Tr. at 324) and as the ALJ pointed out Mr. Hite's functional evaluation did not include a sit-stand at will option, unscheduled breaks, rest for leg elevation, or an assistive device. (Tr. at 23, 594-97.) Nonetheless, the ALJ incorporated the subjective complaints into the RFC by providing Plaintiff a "sit/stand option at will" and limiting his ramp and stair climbing. (Tr. at 24-26.) Finally, the reports of Plaintiff's hemorrhoids come from a few records in the last two months of 2009 and the only

39

treatment provided was rubbing cream. (Tr. at 489.) The sit-stand option might also help this impairment if the problem lingers.

      2.    *The ALJ Properly Weighed the Source Opinions*

Plaintiff's final two arguments are difficult to discern. His second claim states that the RFC's limitation to light work was not supported by any opinion of examining physicians or other medical evidence. (Doc. 11 at 13.) Plaintiff cites Mr. Hite's functional capacity report to support this argument. (*Id.* at 14.) This is an odd selection, as that report paints a relatively robust picture of Plaintiff's health and does not commit to an opinion on Plaintiff's possible malingering. (Tr. at 594.)

Nonetheless, he clutches two somewhat severe limitations in the report: Plaintiff would seldom be off task and he could only sit, stand, or walk for fours in the workday. (Tr. at 594-95; Doc. 11 at 13.) The first restriction is slightly misleading; Mr. Hite could either select "Never" or "Seldom (25%)," among other similar terms with accompanying percentages. (Tr. at 595.) The "Seldom 25%" option, therefore, appears to represent a range rather than a specific selection of twenty-five percent. The ALJ noted that Mr. Hite checked "seldom" and claimed that this opinion was consistent with the RFC/ (Tr. at 26-27.) Thus the ALJ implicitly interpreted "seldom" to mean the range between one and twenty-five percent and, considering Mr. Hite never observed a concentration problem before, considered this to be at the low end of the range. (*Id.*) The ALJ was under no obligation, in any case, to incorporate an "other source" opinion from an ambiguous pre-printed form. Moreover, no other evidence suggests concentration problems. Plaintiff testified the medications make him "a little confused at times," but in his pre-hearing function report he denied

40

that his impairments affected his ability to concentrate, complete tasks, or understand and follow instructions. (Tr. at 201-02.)

Plaintiff next cites a second restriction in Mr. Hite's report: Plaintiff could stand, sit, and walk for four hours in an eight-hour workday. (Tr. at 295.) Yet, Mr. Hite also observed that Plaintiff did not need to elevate his leg, use an assistive device, or even have a sit-stand-walk at will option. (Tr. at 595-96.) Plaintiff needed to walk for five minutes four times per day. (Tr. at 595.) It is thus unclear what position Mr. Hite believed Plaintiff needed to assume if he could not walk, stand, and sit for more than four hours, but did not need to elevate his legs at any point during the day. In any case, the ALJ certainly showed that he considered Mr. Hite's opinions; and as the ALJ discusses elsewhere in his decision, the Record contains ample support to justify any disagreement with Mr. Hite's sit-stand-walk limitation. The ALJ referenced medical imaging results, x-rays, observations, and source opinions spanning the Record that demonstrate Plaintiff's impairments do not preclude some combination for walking, sitting, and standing for eight hours. (Tr. at 20-26.) This evidence included the following: spinal x-rays in 2006 that were negative, (Tr. at 20); a CT scan in 2006 showing "minimal" degenerative changes, (Tr. at 430-31); consistently normal gait, (Tr. at 324, 327-28); minor spurring in the spine, (Tr. at 266-67); Plaintiff's report that his back pain had improved in 2010, (Tr. at 321); and multiple other x-rays and imaging tests showing normal results or only mild problems, (Tr. at 273-75, 282-82, 340, 395-96, 572, 574.) Additionally, Plaintiff's self-reported functional capacity assessment stated that his symptoms and impairments did not affect sitting. (Tr. at 201.)

Other sources are briefly mentioned in Plaintiff's argument. Plaintiff states that Dr. Abou-Chakra put severe limits on Plaintiff's ability to stand and walk. (Doc. 11 at 15; Tr. at 402.) This

is incorrect–a physical therapist filled out this form, not Dr. Abou-Chakra. (*Id.*) The physician's

signature is not on this paperwork, suggesting he did not even review it.[14] Moreover, the functional

limitations portion of these forms is ambiguous. It is located on the initial evaluation sheet and

comes before the "Objective Data" section. (Tr. at 402-03.) The therapist's marginalia includes

personal notes, such as that Plaintiff will "toss [and] turn" when lying supine and that he has

difficulties cooking and cleaning if he "do[es] [it] for a long time." (Tr. at 402.) These clearly are

not observations; nor do they seem to be inferences drawn from observations. Instead, they appear

to be Plaintiff's own report of his restrictions. The therapist's objective findings, in contrast,

showed that Plaintiff walked independently and without assistive devices. (Tr. at 508.) The ALJ

included in his decision this more persuasive, objective evidence from the therapy sessions.

Interspersed in the final two arguments are citations to treating source law, suggesting that

Plaintiff believes Mr. Hite and the physical therapist, both "other sources," were due significant

weight and "good reasons" explanations. (Doc. 11 at 14, 16, 18-19.) He also discusses the law on

"other sources," (Doc. at 11 at 17-18, 20-21), and seems to concede in the reply brief that Mr. Hite

and the physical therapist were not treating sources. (Doc. 14 at 4.) This concession, however,

effectively voids the sizable sections of his argument that are irrelevant to "other source analysis."

(Doc. 11 at 14-19.)

What remains are conclusory comments grounded on questionable interpretations of Mr.

Hite's report, as noted above, along with misinterpretations of the ALJ's findings. Plaintiff states,

without explanation, "[t]he treating physicians diagnosed the above listed impairments and a

---

[14] In fact, while many physical therapy sheets have a line for a physician's signature, (Tr. at 389-92, 510-11), neither of the two that include a physician's signature contain any limitations analysis. (Tr. at 389, 511.) Moreover, during the physical examination, Dr. Abou-Chakra noted Plaintiff's limited spinal range of motion, but found that he had normal motion with his extremities, normal gait, and he could walk on his toes and heels. (Tr. at 573.)

physician's assistant and a physical therapist who cared for claimant for an extended period of time reported how the physician diagnosed impairments affected claimant's ability to function. The ALJ gave these opinions no weight. This was error." (Doc. 11 at 16.) Plaintiff never points to which physician's were "treating physicians," and even had he done so, he never gives any reasons for according them "treating" status. Similarly, he fails to state which "impairments" he refers to or which reports include the diagnoses. In the reply brief he rectifies this oversight, but poorly: he cites Dr. Muhammed Ghali's "referral slip," a single sheet of paper referring Plaintiff for physical therapy for "lumbago," without any other explanation of the diagnosis. (Tr. at 563.) It appears that this is one of the few, if not only, places Dr. Ghali appears in the Record and his relationship with Plaintiff remains a complete mystery. Dr. Shaikh also diagnosed lumbago, (Tr. at 567), and he seems to have interacted with Plaintiff, (Tr. at 530), though there is no discussion of the relationship in the brief.[15]

Stunningly, Plaintiff asserts that the ALJ gave these unnamed "treating physicians," Mr. Hite, and the physical therapist "no weight." (Doc. 11 at 16.) The ALJ actually accepted these diagnoses, concluding that Plaintiff's degenerative disc disease and hip pain were "severe" impairments. (Tr. at 20.) And as noted above, the ALJ relied heavily on Mr. Hite's capacity report, stating that "his conclusions are consistent with the residual functional capacity determined in this decision and they are also supported by the objective evidence of record." (Tr. at 26.) To the extent they diverged on concentration and hours spent sitting, standing, and walking, the ALJ's findings

---

[15] Plaintiff also cites to Dr. Tolson to show he was diagnosed with "back pain, muscle spasms and hip pain." (Doc. 14 at 3.) That citation, however, simply states in the subjective complaints section that Plaintiff had low back pain. (Tr. at 545.) Moreover, the prior notes discuss Plaintiff's poor history of taking medications. (*Id.*) The assessments section does not include back or hip diagnoses. (*Id.*) It is not clear that she diagnosed them in any other visit either.

are well-supported by the Record and properly explained in his decision. These minor differences aside, it is difficult to discover any evidentiary basis for Plaintiff's claims.

Finally, Plaintiff complains that Ms. Hicks's affidavit merited more weight and the ALJ's analysis "was legally erroneous and was contrary to the Regulations and SSR 06-03p." (Doc. 11 at 20-21.) The ALJ wrote a long paragraph discussing the affidavit and complied with SSR 06-3p by considering the nature and extent of the relationship, consistency with other evidence, and other factors supporting and refuting the evidence. (Tr. at 26.) He noted that she was not trained to draw medical conclusions from her observations, her relationship with the Plaintiff might produce bias, and "[m]ost importantly," it contradicted the bulk of the medical evidence. (*Id.*) This was more than sufficient to deal with the brief affidavit. (Tr. at 223-24.)

### 3.    Conclusion

For all these reasons, after review of the record, I suggest that the decision of the ALJ, which ultimately became the final decision of the Commissioner, is within that "'zone of choice' within which decisionmakers may go either way without interference from the courts," *Felisky*, 35 F.3d at 1035 (quoting *Mullen*, 800 F.2d at 545), as the decision is supported by substantial evidence.

## III.    <u>REVIEW</u>

Pursuant to Rule 72(b)(2) of the Federal Rules of Civil Procedure, "[w]ithin 14 days after being served with a copy of the recommended disposition, a party may serve and file specific written objections to the proposed findings and recommendations. A party may respond to another party's objections within 14 days after being served with a copy." Fed. R. Civ. P. 72(b)(2). *See also* 28 U.S.C. § 636(b)(1). Failure to file specific objections constitutes a waiver of any further right

of appeal. *Thomas v. Arn*, 474 U.S. 140, 106 S. Ct. 466, 88 L. Ed.2d 435 (1985); *Howard v. Sec'y of Health & Human Servs.*, 932 F.2d 505 (6th Cir. 1991); *United States v. Walters*, 638 F.2d 947 (6th Cir. 1981). The parties are advised that making some objections, but failing to raise others, will not preserve all the objections a party may have to this Report and Recommendation. *Willis v. Sec'y of Health & Human Servs.*, 931 F.2d 390, 401 (6th Cir. 1991); *Smith v. Detroit Fed'n of Teachers Local 231*, 829 F.2d 1370, 1373 (6th Cir. 1987). Pursuant to E.D. Mich. LR 72.1(d)(2), a copy of any objections is to be served upon this magistrate judge.

Any objections must be labeled as "Objection No. 1," "Objection No. 2," etc. Any objection must recite precisely the provision of this Report and Recommendation to which it pertains. Not later than 14 days after service of an objection, the opposing party may file a concise response proportionate to the objections in length and complexity. Fed. R. Civ. P. 72(b)(2); E.D. Mich. LR 72.1(d). The response must specifically address each issue raised in the objections, in the same order, and labeled as "Response to Objection No. 1," "Response to Objection No. 2," etc. If the Court determines that any objections are without merit, it may rule without awaiting the response.

Date:  July 28, 2014

/S PATRICIA T. MORRIS
Patricia T. Morris
United States Magistrate Judge